UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |  |
|---|---|---|---|

DUANE C. BLAKE,                    )
                                   )
                    Plaintiff,     )
                                   )
          v.                       )    CIVIL ACTION
                                   )    NO. 11-11531-WGY
PROFESSIONAL COIN GRADING SERVICE, )
NUMISMATIC GUARANTY CORPORATION OF )
AMERICA, and COLLECTORS UNIVERSE,  )
INC.,                              )
                    Defendants.    )
                                   )

MEMORANDUM

YOUNG, D.J.                                    October 16, 2012


I.   **INTRODUCTION**

        This is a case of an attorney who claims that he has

discovered a method to grade the "eye appeal" of coins.  Duane C.

Blake ("Blake") is a coin collector and inventor of this method,

which he called the "axial ultimate refractory angle of the coin"

("AURA System" or "AURA").  Blake sought to promote the AURA

System with Professional Coin Grading Service ("Professional

Grading"), Collectors Universe, Inc. ("Universe"), and its

competitor Numismatic Guaranty Corporation of America

("Numismatic") (collectively, the "Defendants").  During initial

talks with the Defendants, Blake communicated some marketing

proposals that adopt the plus (+) symbol in the promotion of the

AURA System.  The Defendants were not interested in working with Blake and instead launched an idea similar to the AURA System. This case revolves around the protectability and confidentiality of Blake's ideas and the duties owed to Blake by the Defendants, if any.

### A.   Procedural Posture

On August 31, 2011, Blake filed a nine-count complaint ("Complaint") against Professional Grading, Universe,[1] and Numismatic, claiming violations of the Lanham Act, conversion, unjust enrichment, civil conspiracy, misappropriation of trade secrets, and unfair business practices.  Compl. ¶ 4, ECF No. 1. Blake further alleged a breach of contract claim and breach of the covenant of good faith and fair dealing against Numismatic. Id.

On October 14, 2011, Professional Grading and Universe moved to dismiss Blake's Complaint in its entirety.  Defs.' Collectors Universe, Inc. & Professional Coin Grading Service's Mot. Dismiss All Counts Pl.'s Compl., ECF No. 12; Defs. Collectors Universe, Inc. & Professional Coin Grading Service's Mem. Law Supp. Mot. Dismiss Pl.'s Compl. ("Universe & Professional Grading's Mem."), ECF No. 13.  On October 28, 2011, Blake filed a memorandum opposing the motion to dismiss, Mem. Supp. Pl.'s Opp'n Defs.

---

[1] Professional Coin Grading Service is a subsidiary of Collectors Universe, Inc., a publicly traded company listed on the NASDAQ.

Collectors Universe, Inc. & Professional Coin Grading Service's
Mot. Dismiss, ECF No. 21, but subsequently refiled it on November
4, 2011, to comply with the twenty-page limit, Mem. Supp. Pl.'s
Opp'n Defs. Collectors Universe, Inc. & Professional Coin Grading
Service's Mot. Dismiss (Re-Submitted Pursuant Court Order Comply
20 Page Limit), ECF No. 24 ("Blake's Opp'n Universe &
Professional Grading's Mot.").[2]  On November 28, 2011, Universe
and Professional Grading submitted a reply brief.  Defs.
Collectors Universe, Inc. & Professional Coin Grading Service's
Reply Br. Supp. Mot. Dismiss Pl.'s Compl. ("Universe &
Professional Grading's Reply"), ECF No. 31.

On November 1, 2011, Numismatic filed a motion to dismiss
Blake's Complaint in its entirety.  Def. Numismatic Guaranty
Corp. Am.'s Mot. Dismiss All Counts Pl.'s Compl., ECF No. 22;
Def. Numismatic Guaranty Corp. Am.'s Mem. Law Supp. Mot. Dismiss
Compl. Pursuant Fed. R. Civ. P. 12(b)(6) ("Numismatic's Mem."),
ECF No. 23.  On November 16, 2011, Blake filed a memorandum
opposing the motion to dismiss.  Mem. Opp'n Numismatic Guaranty
Corp. Am.'s Mot. Dismiss ("Blake's Opp'n Numismatic's Mot."), ECF
No. 26.  On November 28, 2011, Numismatic submitted a reply
brief.  Def. Numismatic Guaranty Corp. Am.'s Reply Mem. Law
Further Supp. Mot. Dismiss Compl. Pursuant Fed. R. Civ. P.

---

[2] Citations to Blake's Opp'n Universe & Professional
Grading's Mot. refer to the ECF system page numbers because
Blake's brief assigned the same page number ("20") to every page.

12(b)(6), ECF No. 30.  On December 8, 2011, Blake filed his sur-reply.  Combined Sur-Reply Defs.' Replies Mot. Dismiss, ECF No. 33.

During the motion hearing held on December 13, 2011, the Defendants declined the Court's invitation to convert the motion to dismiss into a motion for summary judgment.  Mot. Hr'g Tr. 4:11-21, 8:13-25, 9:25-10:19, Dec. 13, 2011, ECF No. 36.  At the motion hearing, Blake's counsel confirmed that the supplementary materials attached as exhibits to the Complaint and referred to therein could properly be considered by the Court at this stage. Id. at 17:3-10.  The Court took the matter under advisement.  Id. at 24:9.

On December 16, 2011, Blake filed a motion for leave to file an amended complaint, attaching the proposed amended complaint and newly discovered documents.  Mot. Leave File First Am. Compl. ("Blake's Mot. Leave to Amend"), ECF No. 35.  Professional Grading and Universe opposed the motion and urged this Court to deny Blake's motion for leave to amend the Complaint, alleging that the amendment disrupts the pending motion to dismiss and is futile because it would not survive scrutiny under Federal Rule of Civil Procedure 12(b)(6).  Defs.' Collectors Universe, Inc.'s & Professional Coin Grading Service's Opp'n Pl.'s Mot. File First Am. Compl., ECF No. 40.  On similar grounds, Numismatic opposed Blake's motion for leave to amend the Complaint.  Def. Numismatic

Guaranty Corp. Am.'s Opp'n Pl.'s Mot. File First Am. Compl.
("Numismatic's Opp'n to Amend"), ECF No. 41.  Blake submitted a
reply brief on January 9, 2012.  Pl.'s Combined Replies Opp'ns
Pl.'s Mot. Leave File First Am. Compl., ECF No. 44.

### B.  Facts as Alleged

Rare coins have avid collectors,[3] and some companies
independently grade, label, and sell those coins.  Compl. ¶ 16.
Coin grading and labeling removes uncertainty as to the coin's
condition and authenticity, which helps to determine its value.
Id. ¶ 23.  Over the past decades, coin dealers have refined the
distinctions among coin grades for valuation purposes, resulting
in a plethora of grading systems and labels.[4]  Blake purports to
have created a new grading system to evaluate the "eye appeal" of
coins.  See id. ¶¶ 29, 33.

---

[3] Numismatic collections are a comparatively recent
phenomenon; ancients do not seem to have collected coins.  Modern
coin collectors appreciate not only the metallic grade of the
coin but also the artistic qualities and condition of the coin.
See, e.g., Holtzman v. Comm'r, 40 T.C.M. (CCH) 350, 351 (T.C.
1980) ("Ancient Greek coins are considered and valued today as
works of art and as an example of ancient Greek art . . . being
viewed by collectors as . . . the epitome of the die cutter's
art.").  As a market serving coin collectors developed, the need
to authenticate coins arose.  Id. ("With respect to coins that
are otherwise comparable, the finer the condition of the coin the
more valuable it is.  Various grades are used by persons offering
coins for sale and by collectors to designate the condition of a
coin.").

[4] Professional Grading was the first company to encapsulate
coins in plastic holders and use a combination of the two older
grading systems, putting letters and numbers together.  See
generally Compl., Ex. A., 1:25-2:15, ECF No. 1-3.

Blake is a coin collector and dealer, doing business in Massachusetts as the Aura Coin Company.[5]  Id. ¶ 6.  As a coin dealer, Blake buys, sells, and grades collectible coins, primarily United States coins.  Id.  Blake is the sole creator and independent owner of the AURA System, which has a pending patent application before the United States Patent and Trademark Office.  Id.; id., Ex. A, United States Patent Application ("Application"), ECF No. 1-3.  AURA has a priority date of July 14, 2009, and the patent application was made public on June 2, 2011.  Id. ¶ 6 & n.3.

Blake postulates a new twist to refine the distinctions among coins of the same grade.  The AURA System proposes grading the "eye appeal" of coins with labels that grade the overall appearance of a coin within the same numeric grade.  See Application 4:25-36.  To achieve eye appeal, the AURA System evaluates the "axial ultimate refractory angle of the coin" (hence the name AURA).  Id. at 5:20-38.  Blake posits certain symbols[6] as labels for the "eye appeal" grade:

---

[5] Blake has sued on his own behalf; the Aura Coin Company is not a party to this action.

[6] In essence, a symbol is a visible sign whose meaning is not evident by itself, but is communicated by association or convention (e.g., a dotted line preceded by scissors (✂ - -) expresses an abstract idea: the verb "cut").  Symbols were used long before societies stamped coins with them.  See Andre Leroi-Gourham, Prehistoire de l'Art Occidental (Paris, Lucien Mazenod ed., 1965) (explaining that the system of Paleolithic art is based on the complementarity of abstract symbols and realistic

> The manner of labeling is flexible, and also contemplates placing . . . other colors or material (e.g., a label or sticker), characters (e.g., alphanumeric, roman, Arabic, Chinese, etc.), symbols (e.g., QWERTY symbols [i.e. typewriter or computed keyboard symbols] text, pictures, art) and colors at any place on/inside of a coin holder (so long as view of the coin itself is not obscured). This includes labeling that is embedded in or part of the coin holder itself (e.g., a colored or etched coin holder or alpha-numeric or symbolistic grade). As a definitive example in this case, the AURA designator of above average 51, average 53 and below average 55 can be alternatively labeled with any QWERTY symbol. For example, a "+" [Plus] sign can be printed on the label to indicate an above-average quality coin . . . .

Id. at 14:19-27.  Blake proposed labeling the coin's eye appeal and taking a digital photograph during the grading process to have a record of the coin, which would allow a collector to track any alterations or modifications to the coin's condition.[7]

Compl. ¶ 30.

---

animal paintings).  Originally, symbols were stamped in coins primarily with two purposes: symbols were predominantly used to describe under whose authority (a king, city, or deity) the coin was struck.  For instance, a gold Stater used around 358-340 B.C. in Phillipi, Macedonia was imprinted with the head of Hercules in a lion skin, as a symbol of the king's magistrate power.  Symbols were also used - albeit unfrequently - to depict the artist's signature.  Fifth century silver coins from Syracuse, Sicily are remarkable for the frequency of artists' signatures, but the use of a mark as a signature has been more commonly found in other forms of artistic expression like silverware or jewelry to designate the maker of the piece.

[7] A significant problem in numismatics is "coin doctoring," that is treating rare coins with chemicals or heat in an effort to increase their eye appeal, and hence the condition and value of the coin.  Compl. ¶ 31 n.8.  Coin doctoring is considered unlawful if done with fraudulent intent.  See, e.g., United States v. Sheiner, 273 F. Supp. 977, 982-84 (D.C.N.Y. 1967).

Before Blake developed the AURA System, Numismatic already used a star (★) symbol next to the numerical grade on the plastic holder to designate a coin that had exceedingly beautiful eye appeal within its assigned grade.  Application 2:28-30. Professional Grading also considers the eye appeal of a coin as one factor in its "PQ" (Premium Quality) label.  See Blake's Opp'n Numismatic's Mot., Ex. B, at 4, ECF No. 26-2.

The main problem that Blake seeks to resolve with AURA is that, while "each [coin grading] service may utilize the same technical numerical grading system, . . . no coordination exists for the consistant [sic] recognition of eye appeal within the industry."  Application 3:35-37.

Blake brought suit against Universe, Professional Grading, and Numismatic.  Compl. ¶¶ 7-9.  Universe is a Delaware corporation and has its principal place of business in California.  Id. ¶ 9.  Professional Grading is an unincorporated division of Universe in the business of providing third-party grading services to coin collectors and dealers.  Id. ¶ 7.[8]

---

[8] Universe is being sued only in its capacity as the parent company of Professional Grading.  See Compl. ¶ 9.  Blake claims that Universe and Professional Grading are closely related and that many of the allegations ought apply with equal force to both parties.  Id.  Professional Grading is the company Blake had direct interaction with through David Hall ("Hall"), but Hall is at the same time the founder of Professional Grading and Universe's CEO.  Id. ¶¶ 38, 58.  Therefore, Universe's fate is necessarily tied to Professional Grading for purposes of this motion to dismiss.  The discussion of this motion will refer solely to Professional Grading, while Universe will be referred

Numismatic is a privately owned corporation located in Florida and New Jersey, with its principal place of business in Florida, and it is also in the business of providing third-party grading services to coin collectors and dealers.  Id. ¶ 8.

Blake claims that Professional Grading and Numismatic rebranded AURA and launched the plus (+) designation[9] based on previous communications Blake had with both companies.  In late 2008, Blake contacted David Hall ("Hall"), Professional Grading's founder and Universe's CEO, to propose market testing the AURA System.  Id. ¶ 38.  Hall referred Blake's proposal to Don Willis

---

to only when the Court rules on the specific counts.

[9] The plus (+) symbol is of ancient origin and was used widely in art.  The cross with arms of equal length traditionally is known as the Greek cross.  It was not until the fifteenth century the plus (+) symbol was used in arithmetic for the addition function as a simplification of the Latin "et."  In modern times, the plus (+) symbol is used for other purposes as well: for example, it is a commonly accepted method of demonstrating an increment within the same grade, as in academic grades, where, e.g., an A+ is higher than an A.  Vexillologists will recognize the Greek cross on the flag of Switzerland, the International Red Cross, in the canton of the flag of Greece, and the letter "X" flag in the International Signal Code.  H. Gresham Carr, Flags of the World, plates I, XVII, XXXV (1953).  Students of military decoration know it as the central motif of the Military Order of the Merit (Spain).  See, e.g., Vaclav Mericka, Orders and Decorations, plates 22, 41(c) (Paul Hamlyn Ltd., 1967); Order of Manuel Amador Guerrero (Panama) Robert Werlich, Orders and Decorations of All Nations: Ancient and Modern, Civil and Military, fig. 762 (1965) Order of Merit of the Republic (Italy) Guido Rosignoli, Ribbons of Orders, Decorations and Medals, plate 41 (13) (1976); and the Stars of the Order of the Garter and the Order of St. Michael and St. George and the George Cross (United Kingdom), and the Order of the Holy Lamb (Finland); Poul Ohm Hieronymussen and Jørgen Lundø, Europæiske Ordner I Farver, figs. 60, 65, 81, 99 (1966).

("Willis"), Professional Grading's President, who ultimately rejected the proposal. Id. ¶ 39. Only publicly known aspects of AURA were discussed during the conversations between Blake and Willis. Id.

On April 29, 2009, before filing the patent application, Blake communicated via e-mail with David W. Lange ("Lange"), Research Director at Numismatic, to propose market testing the AURA System. Blake's Opp'n Numismatic's Mot., Ex. B, at 7, ECF No. 26-2. In that same e-mail, Blake indicated that he had contributed to the Lincoln Cent Matte Proofs book authored by Kevin Flynn ("Flynn"), wherein Blake published part of his AURA grading system. Id. at 6-7. Lange responded to the e-mail, stating he already had a copy of the book, and referred the AURA offer to Numismatic's Marketing Director, Scott Schechter ("Schechter"). Id. at 6.

Blake sent a confidentiality agreement ("Agreement") to Schechter on July 26, 2009, but Schechter misplaced the Agreement. Compl. ¶¶ 44-46. On August 18, 2009, at the beginning of a telephone conference between Blake and Schechter, Blake e-mailed another copy of the Agreement to Schechter, who promised to sign and return it. Id. ¶ 46. Schechter expressly agreed to treat all disclosures made by Blake as confidential. Id. Blake subsequently disclosed the AURA System and his marketing strategy to Schechter. Id. ¶¶ 47-50. During the call,

Blake described to Schechter his previous unsuccessful proposal to Professional Grading. Id. ¶ 48. After that conversation, Schechter did not communicate with Blake or respond to his requests for the signed Agreement, even though Blake sent Schechter two additional copies. Id. ¶¶ 55-57. Blake alleges that Numismatic disclosed confidential information to Professional Grading. Id. ¶¶ 65, 126.

Blake referenced in his Complaint certain of the Defendants' marketing materials. These appear to show that on March 25, 2010, Professional Grading and Numismatic together launched the plus (+) designation by adding to the numeric Sheldon System grade a plus (+) symbol to indicate a coin of a higher quality within its specific grade. Id. ¶ 60. Professional Grading stated that one of the goals of labeling coins with the plus (+) symbol is to demonstrate "[i]ncreased recognition of high-end coins within each grade." Blake's Opp'n Universe & Professional Grading's Mot., Ex. A, PCGS Secure Plus, ECF No. 21-1. Numismatic also stated that "coins receiving a + must have above-average eye appeal." Blake's Opp'n Numismatic's Mot., Ex. F, ECF No. 26-6. Professional Grading and Numismatic have branded their grading system as SecurePlus and "+" respectively. Compl. ¶ 61. Blake claims that the plus (+) grading announced by Professional Grading and Numismatic is nearly identical to the AURA System and

that representatives at Numismatic must have disclosed it to
Professional Grading.  Id. ¶¶ 64-66.

Blake alleges that he was injured as a result of the
Defendants' conduct and that the image and marketability of the
AURA System were damaged because he has been unlawfully deprived
of the opportunity to license the AURA System and lost expenses
associated with his patent and trademark applications.  Id. ¶¶
67-74.

### C.   Federal Jurisdiction

This Court's jurisdiction arises under the Lanham Act, 15
U.S.C. § 1125(a), conferred by 28 U.S.C. §§ 1331, 1338.
Supplemental jurisdiction arises under 28 U.S.C. § 1367(a) as to
the state law claims.

Moreover, there is complete diversity for the remaining
claims under 28 U.S.C. § 1332(a).  Blake is a Massachusetts
resident.  Professional Grading is a subsidiary of Universe, a
Delaware corporation, and has its principal place of business in
California.  Numismatic is located in Florida and New Jersey,
with its principal place of business in Florida.  The amount in
controversy exceeds $75,000, exclusive of interest and costs.

## II.  ANALYSIS

### A.   Legal Standard

To survive a motion to dismiss for failure to state a claim
upon which relief may be granted, the plaintiff must present

facts that make his claim plausible on its face.  <u>Bell Atl. Corp.</u>
v. <u>Twombly</u>, 550 U.S. 544, 570 (2007).  A viable complaint must be
well-pleaded, in that it must contain "more than labels and
conclusions, and a formulaic recitation of the elements of the
cause of action."  <u>Id.</u> at 555.  When evaluating a motion to
dismiss, the Court "must take all the factual allegations in the
complaint as true."  <u>Maldonado</u> v. <u>Fontanes</u>, 568 F.3d 263, 266
(1st. Cir 2009) (quoting <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 678
(2009)) (internal quotation mark omitted).

In the present motion to dismiss, Blake urges the Court to
consider the documents attached as exhibits to the Complaint and
referenced therein.  <u>See</u> Mot. Hr'g Tr. 17:3-10; Blake's Opp'n
Universe & Professional Grading's Mot. 1-2; Blake's Opp'n
Numismatic's Mot. 1-2.  Under the Federal Rules of Civil
Procedure, if "matters outside the pleadings are presented to and
not excluded by the court, the motion [to dismiss] must be
treated as one for summary judgment under Rule 56."  Fed. R. Civ.
P. 12(b).  Even so, when the record contains supplementary
material filed outside the pleadings, the motion to dismiss is
not automatically converted into a motion for summary judgment.
<u>Garita Hotel Ltd. P'ship</u> v. <u>Ponce Fed. Bank, F.S.B.</u>, 958 F.2d 15,
18 (1st Cir. 1992) ("In other words, the test is not whether
supplementary materials were filed, but whether the court

actually took cognizance of them, or invoked Rule 56, in arriving at its decision.").

In the interest of fairness, this Court invited the parties to convert the present motion to dismiss into one for summary judgment, Mot. Hr'g Tr. 4:11-21, an offer that was declined by the parties, id. at 8:13-25, 9:25-10:19.  Therefore, this Court will treat the present motion as a motion to dismiss under the Rule 12(b)(6) standard.

Under Rule 12(b)(6), a court may consider: (I) the complaint, the documents annexed to it, and other materials fairly incorporated; (ii) documents referred to in the complaint but not annexed to it; and (iii) matters that are susceptible to judicial notice.  Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 12 (1st Cir. 2004) (citations omitted).  The court may not consider, however, affidavits and miscellaneous documents proffered by the parties.  Id.

In light of these principles, this Court may consider the facts alleged in Blake's Complaint, the patent application annexed to it, Compl. ¶ 6, and the documents referred to in the Complaint but not annexed to it, namely, the Federal Trade Commission Consent Decree, id. ¶ 73, the Confidentiality Agreement, id. ¶ 44, the communications that Blake exchanged with Professional Grading and Numismatic, id. ¶¶ 38-39, 42-45, 445, Professional Grading and Numismatic's announcement of SecurePlus,

14

and "+" labels, <u>id.</u> ¶¶ 58-61, and marketing materials, <u>id.</u> ¶¶ 3, 7-9, 140.

**B.  Blake's Proposed Amended Complaint Is Futile**

Under Federal Rule of Civil Procedure 15(b), the Court should grant leave to amend "when justice so requires."  Fed. R. Civ. P. 15(b).  Denial of the motion for leave to amend is justified whenever there is bad faith, delay, or undue prejudice. <u>Colmenares Vivas</u> v. <u>Sun Alliance Ins. Co.</u>, 807 F.2d 1102, 1108 (1st Cir. 1986).  "If leave to amend is sought before discovery is complete and neither party has moved for summary judgment," the proposed amended complaint is futile only if it could not withstand a Rule 12(b)(6) motion to dismiss.  <u>Hatch</u> v. <u>Dep't for Children, Youth and Their Families</u>, 274 F.3d 12, 19 (1st Cir. 2001) (citing <u>Glassman</u> v. <u>Computervision Corp.</u>, 90 F.3d 617, 623 (1st Cir. 1996)).

Blake's proposed amended complaint is intended to expand upon and afford greater detail to the numerous evidentiary documents and factual allegations already pleaded in the original Complaint.  Blake's Mot. Leave to Amend 3 (stating that the original Complaint and incorporated documents "gave Defendants full and clear notice as to the claims against them" but that Blake "believes that a clarification of the Complaint could only facilitate the simplification and progress of these proceedings").  The Defendants contend that the proposed amended

15

complaint is futile because it does not add new causes of action and simply incorporates the various arguments contained or referenced in Blake's opposition and sur-reply.  Numismatic's Opp'n to Amend 1.

A careful review of the record confirms that all the proposed factual allegations are already pleaded or incorporated in the original Complaint, and the proposed amended complaint rests on the same body of facts.  The only new fact introduced in the proposed amended complaint relates to Professional Grading's patent application that went public after the filing date of the Complaint.  Blake's Mot. Leave to Amend 1.  This newly discovered fact "strengthens" Blake's misappropriation claim, id. at 2, but makes no material difference in the case.  Finnern v. Sunday River Skiway Corp., 984 F.2d 530, 536 (1st Cir. 1993) (holding that an amendment to a complaint is "futile" if it merely adds "facts and arguments already set forth by the [previously filed] pleadings").  In other words, if the original Complaint does not withstand a motion to dismiss, the proposed amended complaint would fail largely for the same reasons.  Therefore, it would be futile to allow the Complaint to be amended before ruling on the present motion to dismiss.  The only effect would be to delay resolution.

### C.   Blake's Alleged Confidential Information

The crux of the motion to dismiss is the confidentiality of

the information Blake communicated to the Defendants. Specifically, the analysis turns on whether use of the plus (+) symbol to indicate higher quality within the same coin grade falls within the bounds of general knowledge, whether Blake publicly disseminated information about the AURA System, and whether the Defendants disclosed confidential information about Blake's marketing plan to promote the AURA System.

The Defendants allege that Blake fails to plead any facts that would allow this Court to distinguish the aspects of the AURA System in the public domain from those allegedly disclosed confidentially.  Universe & Professional Grading's Reply 6; <u>see also</u> Universe & Professional Grading's Mem. 8; Numismatic's Mem. 14.

Under <u>Iqbal</u>, Blake has to do more than simply invoke the label "confidential information."  <u>See</u> 556 U.S. at 678.  The test for determining whether information is, in fact, confidential, has both an objective and subjective component:

> The test is objective in the sense that the information must be of the kind that a reasonable person would recognize as exclusive or private and likely to be known or appreciated only by its possession, even if it does not amount to a "secret" in the popular sense of the word.
> Information that is, on the other hand, readily known or knowable to the interest of the public cannot . . . be made confidential simply by slapping it with a restrictive label.
> The test is subjective in the sense that the party imparting the information must manifest an expectation that it will be kept private by the person to whom it is conveyed.

> One obvious measure of whether a party truly regards
> information as confidential is the extent to which it
> takes diligent precautions to safeguard the information
> from inadvertent dissemination or improper use by others.

Foster-Miller, Inc. v. Babcock & Wilcox Canada, 210 F.3d 1, 10

(1st Cir. 2000) (quoting jury instructions).

### 1. Use of the Plus (+) Symbol to Indicate a Coin's Grade Was General Knowledge

Confidential information "must be of the kind that a

reasonable person would recognize as exclusive or private and

likely to be known or appreciated only by its possession."

Foster-Miller, 210 F.3d at 10 (quoting jury instructions).  It is

federal policy "that all ideas in general circulation be

dedicated to the common good unless they are protected by a valid

patent."  Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489

U.S. 141, 159-60 (1989) (quoting Lear, Inc. v. Adkins, 395 U.S.

652, 668 (1969)) (internal quotation marks omitted).  "Once an

inventor has decided to lift the veil of secrecy from his work,

he must choose the protection of a federal patent or the

dedication of his idea to the public at large."  Id. at 149.

Here, the AURA System proposed many symbols as possible

labels for the "eye appeal" grade based on the "axial ultimate

refractory angle of the coin."  Application 14:19-27 (noting that

"[t]he manner of labeling [the eye appeal] is flexible," that it

can use colors, characters, and symbols, and that, for instance,

it "can be alternatively labeled with any QWERTY symbol.  For

18

example, a '+' [Plus] sign can be printed on the label to indicate an above-average quality coin."). This is exactly what Numismatic did, and still does, to evaluate the "eye appeal" of coins, even before Blake developed the AURA System. Id. at 2:28-30 (explaining that Numismatic uses the star (★) symbol next to the numerical grade to credit a coin's eye appeal).

The only difference between the method developed by Blake and those of the Defendants is that the AURA System consists of evaluating the "axial ultimate refractory angle of the coin." See id. at 5:20-38. Blake does not allege any facts indicating that the Defendants evaluate the "axial ultimate refractory angle of the coin." Rather, Blake's claims relate to the Defendants' use of the plus (+) symbol "to indicate a coin of a higher quality within its specific grade." Compl. ¶ 60. Moreover, the Defendants point out that within the numismatic grading systems, the plus (+) symbol has been generally used in the industry since the 1970s for the purpose of distinguishing higher quality coins within the same grade. Universe & Professional Grading's Mem. 11 n.7.

Therefore, Blake's Complaint does not allege facts sufficient to make it plausible that he owned proprietary rights in the plus (+) designation.[10] Blake cannot claim ownership of

---

[10] Although unfair competition statutes "may result in the creation of 'quasi-property rights' in communicative symbols, the focus is on the protection of consumers, not the protection of

the plus (+) symbol to indicate a higher quality within the same coin grade because it is a symbol in the public domain and commonly used in the coin grading industry.  In addition, the Defendants do not use the symbol to grade the "axial ultimate refractory angle of the coin."  Moreover, because this information was in the public domain, Blake could not restrain others from using it by simply labeling it "confidential information."  See Iqbal, 556 U.S. at 678.  Stating that such information is "confidential information" is but a conclusory statement that cannot survive a motion to dismiss.

>    **2.    Blake Publicly Disseminated the Information About the AURA System**

"[I]deas in the public domain remain there for the free use of the public."  Aronson v. Quick Point Pencil Co., 440 U.S. 257, 262 (1979).  Information "readily known or knowable to the interest of the public cannot . . . be made confidential simply by slapping it with a restrictive label."  Foster-Miller, 210 F.3d at 10.  "Information cannot be confidential if the possessor of the information does not take reasonable security precautions

---

producers as an incentive to product innovation."  Bonito Boats, 489 U.S. at 157.  Additionally, "[t]he term PLUS is an everyday word that indicates something added, and when applied to goods, it merely implies additional quantity or quality . . . . [The abundant] different uses of marks that include the word PLUS[] suggest[] a generic character."  Plus Prods. v. Plus Discount Foods, Inc., 722 F.2d 999, 1005 (2nd Cir. 1983) (listing cases in which the United States Patent and Trademark Office Trademark Trial and Appeal Board held that the "PLUS" trademark was weak).

to protect it." Knapp Schenck & Co. Ins. Agency, Inc. v. Lancer
Mgmt. Co., No. Civ.A. 02-12118-DPW, 2004 WL 57086, at *8 (D.
Mass. Jan. 13, 2004) (Woodlock, J.) (citing USM Corp. v. Marson
Fastener Corp., 379 Mass. 90 (1979)).

Here, to the extent that Blake filed a patent application
for the AURA System, he cannot claim that it was confidential
information as of the date of the patent publication on June 2,
2011. See Brooks Automation, Inc. v. Blueshift Techs., Inc., No.
05-3973-BLS2, 2006 WL 307948, at *8 (Mass. Super. Jan. 24, 2006)
(Gants, J.) (holding that the plaintiff's theory was devoid of
any factual support because it "never articulated with precision
which trade secrets or confidential information had been stolen
and never appeared to have carefully considered whether its so-
called trade secrets or confidential information were already in
the public domain through patent disclosures").

The AURA System was readily known or knowable to the
Defendants because Blake voluntarily disseminated the
information.  Additionally, Blake voluntarily disclosed
"publicly-known aspects" of the AURA System to Professional
Grading without any obligation of confidentiality.  Compl. ¶ 39.
Moreover, those aspects of the AURA System were publicly known
before the patent application due to Blake's voluntary
disclosures.  Blake's Opp'n Numismatic's Mot., Ex. B, at 5-6
(indicating that Blake had contributed to the Lincoln Cent Matte

<u>Proofs</u> book authored by Flynn by publishing a chapter explaining the AURA System).  On April 29, 2009, Blake offered his publication to Lange, Research Director at Numismatic, who responded by saying that he already had a copy of the book.  <u>Id.</u> at 7.  The community of coin collectors were discussing the eye appeal factor on internet forums, and Blake readily pointed out these discussions in an e-mail to Lange and Schechter before any confidential relationship existed.  <u>Id.</u> at 4-5.

To the extent that Blake voluntarily disclosed the alleged "confidential information" of the AURA System to the Defendants and the public, Blake did not have a property interest in this information because it was either already in the public domain, <u>see</u> <u>Bonito Boats</u>, 489 U.S. at 149; <u>Aronson</u>, 440 U.S. at 262, or it was voluntarily disseminated before a confidential relationship existed, <u>Knapp Schenck & Co. Ins. Agency</u>, 2004 WL 57086, at *8 ("An implied confidential relationship can be defeated [] if the disclosing party voluntarily conveys a trade secret to another without limitation upon its use." (alteration in original) (quoting <u>Burten</u> v. <u>Milton Bradley Co.</u>, 763 F.2d 461, 463 (1st Cir. 1985)) (internal quotation marks omitted)).

Therefore, Blake's claim that he owns "confidential information" or a trade secret over the AURA System is no more than a label and a conclusion not supported by the facts alleged in the Complaint.

### 3.   Blake Sufficiently Alleges that the Defendants Disclosed Confidential Marketing Information

Confidential information "must be of the kind that a reasonable person would recognize as exclusive or private and likely to be known or appreciated only by its possession, even if it does not amount to a 'secret' in the popular sense of the word." Foster-Miller, Inc., 210 F.3d at 10. "[T]he party imparting the information must manifest an expectation that it will be kept private by the person to whom it is conveyed." Id.

Here, the use of the plus (+) symbol in the coin grading industry was not confidential information or a secret. See supra section II.C. Blake, however, also proposed a marketing plan to both Professional Grading and Numismatic to promote the plus (+) symbol as a grade for determining a coin's "eye appeal." Compl. ¶¶ 38, 40. Although Blake proposed only publicly known aspects of the AURA System to Professional Grading, id. ¶ 39, Blake alleges that he shared confidential aspects of his marketing test ideas to Numismatic, see id. ¶¶ 46, 50. There was some expectation that Numismatic would keep this information private, and Schechter expressly agreed to do so. Id. ¶ 46.

Blake's marketing test ideas included a proposal to work jointly with other firms in the coin grading industry because the particularly fragmented nature of the industry makes it nearly impossible for any single enterprise to unilaterally standardize a labeling methodology for the eye appeal concept. Application

23

3:35-37.  Blake proposed the plus (+) symbol as a marketing tool to promote his eye appeal grade during conversations with Numismatic.  See Compl. ¶ 62.  This same symbol is the one that the Defendants allegedly introduced together, despite being competitors.  Id. ¶ 60.  The fact that Numismatic's use of the plus (+) symbol overlaps with its star (★) symbol to credit the eye appeal of a coin also tends to substantiate Blake's allegations.  Blake's Opp'n Numismatic's Mot., Ex. F ("[C]oins receiving a + must have above-average eye appeal.").

Therefore, Blake sufficiently alleges that the proposed marketing plan was not in the public domain and that Numismatic disclosed the information, despite the existence of an oral agreement with Blake to keep it confidential.

### 4.   Conclusion as to Blake's Confidential Information Allegations

While the overarching analysis of the alleged confidential information plays out differently in each count, it effectively eliminates the claimed protection of the AURA System and the plus (+) designation, and it leaves viable only those claims premised on Blake's marketing plan.  Most of the alleged damages that Blake seeks relate to the AURA System itself.  Blake, however, may still be entitled to damages for the tortious acts regarding his confidential marketing plan, if the evidence so supports, and he can proceed on those factual grounds.

**D.    Violation of Section 43(a) of the Lanham Act (Count I)**

The Lanham Act imposes liability on:

> Any person who . . . in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion . . . as to the origin . . . of [its] goods [or] services . . . , or in commercial advertising or promotion, misrepresents the nature, characteristics [or] qualities . . . [of] another person's goods [or] services.

15 U.S.C. § 1125(a)(1) (commonly known by its Public Law designation, "Section 43(a)"). "A typical scenario involves 'passing off,' where a defendant sells its own goods or services while falsely representing that they come from the plaintiff; this claim is a 'close cousin' of other trademark infringement actions, except that it is available to those with unregistered marks." John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 45 (1st Cir. 2003) (citing PHC, Inc. v. Pioneer Healthcare, Inc., 75 F.3d 75, 78 (1st Cir. 1996)); see also Zyla v. Wadsworth, Div. of Thomson Corp., 360 F.3d 243, 251 (1st Cir. 2004) ("[Section] 43(a)(1) is not limited to the protection of trademark holders.").

The converse of "passing off" is "reverse passing off," which occurs when "[t]he producer misrepresents someone else's goods or services as his own." Dastar Corp. v. Twentieth Century

<u>Fox Film Corp.</u>, 539 U.S. 23, 27 n.1 (2003).  While the majority of case law runs in the opposite direction, the First Circuit has never expressly recognized claims involving the "reverse passing off" cause of action.  <u>See</u> <u>John G. Danielson</u>, 322 F.3d at 45 (refusing to decide whether the First Circuit recognizes the "reverse passing off claim" yet assuming for purposes of the appeal that it does).  <u>But see</u> <u>Kasco Corp.</u> v. <u>Gen. Servs., Inc.</u>, 905 F. Supp. 29, 33-35 (D. Mass. 1995) (holding that "[g]iven the language of the amended Lanham Act, its unambiguous legislative history, and the subsequent uniform case law, there is little doubt that the statute codifies the dominant expansive interpretation of the old statute," rejecting the argument that "reverse passing off" is not actionable in the First Circuit, and concluding that "[s]uch may have been the case in the prior regime; 'reverse [passing] off' may very well now be actionable under the amended statute").

    The First Circuit, however, has not had the opportunity to address this issue since the Supreme Court's decision in <u>Dastar</u>.  In <u>Dastar</u>, the Supreme Court held that the enactment of the Trademark Law Revision Act of 1988 clarified that "[Section 43(a)'s] language is amply inclusive . . . of reverse passing off — if indeed it does not implicitly adopt the unanimous court-of-appeals jurisprudence on that subject."  539 U.S. at 30.

### 1.   Blake Fails to Allege False Designation of Origin

The Lanham Act prohibits individuals from misrepresenting someone else's goods or services as their own.  See Dastar, 539 U.S. at 27 n.1.  Under Section 43(a), individuals may not falsely misrepresent the origin of goods, whether it be the geographic area, the source, or the manufacturer of the physical "good" sold to the public.  Id. at 29.  The Lanham Act, however, does not include in the term "origin" the "author of any idea, concept, or communication embodied in those goods."  Id. at 37.  The Lanham Act does not stretch to protect "communicative products," which the Supreme Court in Dastar described as those products that are "valued not primarily for [their] physical qualities . . . but for the intellectual content that [they] convey[]."  Id. at 33. Such intellectual property is protected, if at all, by copyright and patent laws.  Id. at 33-34.

Here, Blake's claim is one of authorship.  Blake essentially alleges that the Defendants' use of the "SecurePlus" and "+" labeling methodologies is "likely to cause confusion . . . as to the origin . . . of goods."  Blake argues that the Defendants impliedly represent that they are the creators of the "+" labeling methodology used to indicate a coin's eye appeal. Compl. ¶¶ 76-77.  Yet the "+" symbol is a communicative product embedded in the AURA System, to which Blake claims authorship.

27

The Defendants are not required under trademark law to credit the creative source behind a mark or good - such an obligation is imposed only in the realms of copyright and patent law. <u>Dastar</u>, 539 U.S. at 37; <u>see also</u> <u>Zyla</u>, 360 F.3d at 252.

## 2. Blake Fails to Allege False Advertising of the Nature, Characteristics, or Qualities of AURA

Section 43(a)(1)(B) of the Lanham Act prohibits misrepresentations of "the nature, characteristics, qualities, or geographic origin of . . . goods" in connection with "commercial advertising or promotion[s]." 15 U.S.C. § 1125(a)(1)(B). In dicta, the Supreme Court in <u>Dastar</u> left open the possibility that some false authorship claims could be brought under Section 43(a)(1)(B)'s prohibition of false advertising. 539 U.S. at 38.[11] This possibility has been recognized in dicta by the First Circuit. <u>Zyla</u>, 360 F.3d at 252. No court in the First Circuit, however, has resolved the issue of whether authorship is a part

---

[11] The Supreme Court in <u>Dastar</u> stated:

> If, moreover, the producer of a video that substantially copied the Crusade series were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series, then one or more of the respondents might have a cause of action — not for reverse passing off under the "confusion . . . as to the origin" provision of § 43(a)(1)(A), but for misrepresentation under the "misrepresents the nature, characteristics [or] qualities" provision of § 43(a)(1)(B).

<u>Dastar</u>, 539 U.S. at 38 (alteration in original).

of the nature, characteristic, or quality of "communicative products" under Section 43(a)(1)(B).

Other courts that have addressed the issue rejected this reading of Dastar. See, e.g., Baden Sports, Inc. v. Molten USA, Inc., 556 F.3d 1300, 1308 (Fed. Cir. 2009), cert. denied, 130 S. Ct. 111 (2009) (holding that a claim of false attribution of authorship of an innovation in an advertisement "[does] not go to the 'nature, characteristics, [or] qualities' of the goods, and [is] therefore not actionable under section 43(a)(1)(B)"); Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC, 467 F. Supp. 2d 394, 400 (S.D.N.Y. 2006) ("If authorship were a 'characteristic[ ]' or 'qualit[y]' of a work, then the very claim Dastar rejected under § 43(a)(1)(A) would have been available under § 43(a)(1)(B).").

Here, Blake premises his false advertisement claim on two factual bases: (1) the alleged renaming and rebranding of the AURA System as "SecurePlus" and "+" labeling methodology; and (2) the alleged false description and representations of the "SecurePlus" and "+" labeling methodology.  Compl. ¶ 77.[12]

_____

[12] Additionally, Blake raises the violation of the United States Federal Trade Commission Consent Decree (August 16, 1990) ("FTC Decree") in support of his Lanham Act claim.  Compl. ¶ 73. The FTC Decree permanently enjoins Professional Grading from claiming that its "grading is 'objective,' 'consistent' or 'unbiased,' if such representation is contrary to fact."  Blake's Opp'n Professional Grading & Universe's Mot., Ex. B, Consent Decree 2, ECF No. 21-2.  First, it is beyond dispute that the

The first claim is troubling because it is nothing more than
a repackaging of the false designation of origin claim under
Section 43(a)(1)(B).  Put that way, it is still a copyright or a
patent claim.  <u>Dastar</u>, 539 U.S. at 37 (asserting that the Lanham
Act was "<u>not</u> designed to protect originality or creativity," as
opposed to "the copyright and patent laws [] which <u>were</u>").  Nor
does the possible exception set out in <u>Dastar</u> apply to this

---

Federal Trade Commission has not initiated any action against
Professional Grading for violation of its decree.  Moreover,
Blake has no standing to enforce the FTC Decree.  <u>Biovail Corp.</u>
<u>Int'l</u> v. <u>Hoechst Aktiengesellschaft</u>, 49 F. Supp. 2d 750, 762
(D.N.J. 1999) ("[A] consent decree is not enforceable directly or
in collateral proceedings by those who are not parties to it,
even though they were intended to be benefited by it." (quoting
<u>Blue Chip Stamps</u> v. <u>Manor Drug Stores</u>, 421 U.S. 723, 750 (1975))
(internal quotation marks omitted)).

    Second, to the extent that Blake alleges that this Court
ought be influenced by the FTC Decree to conclude that the
Defendants' conduct violated the Lanham Act, <u>see</u> <u>In re TJX Cos.</u>
<u>Retail Sec. Breach Litig.</u>, 564 F.3d 489, 496 (1st Cir. 2009);
<u>Good</u> v. <u>Altria Grp., Inc.</u>, 501 F.3d 29, 57 (1st Cir. 2007), Blake
has failed to allege that they exaggerated the reach of the
methodology to the detriment of AURA.

    Blake alleges that Professional Grading has engaged in
exaggerated and misleading commercial advertisement in violation
of the FTC Decree.  Additionally, Blake alleges that Professional
Grading is damaging AURA's goodwill and business reputation,
Compl. ¶¶ 82-83, by promoting the "SecurePlus" labeling
methodology and creating the misleading impression that it can
grade objectively and achieve "consistent grading" of coins,
Blake's Opp'n Universe & Professional Grading's Mot. 8, 9-10.

    Even if Professional Grading used the term "consistent" in
violation of the FTC Decree, Blake simply has failed to allege
that it exaggerated the reach of the methodology to the detriment
of AURA.  Blake himself claims that the AURA System provides a
method that "objectively" and "systematically" assesses the eye
appeal of coins.  <u>See, e.g.</u>, Application 4:26, 8:13-15 ("[T]here
is currently no way to objectively and consistently quantify a
coin's eye appeal . . . . [T]he [AURA] invention [does] just
that."  <u>Id.</u> at 8:13-15).

claim.  The Supreme Court stated that if the copier of a
communicative product used advertising or promotion to give
consumers the impression that its product was "quite different"
from the plaintiff's, then there might be a cause of action for
misrepresentation under the "misrepresents the nature,
characteristics [or] qualities" provision of Section 43(a)(1)(B).
Id. at 38.

Since Blake has never marketed coins labeled with the AURA
System, the public could not have been misled into believing that
the AURA System has a "quite different" nature, characteristic,
or quality than "SecurePlus" and "+" labeling methodology.  Blake
claims that the Defendants' methodologies are mere rebranding and
"virtually identical" to AURA, Compl. ¶ 64, yet Blake does not
show how the Defendants' attempt to differentiate the
"SecurePlus" and "+" labeling methodology from the AURA System;
indeed, the Defendants do not even mention the AURA System in
their marketing or advertising materials.

The grading process does not change the nature,
characteristics, or qualities of the coin.  Arguably, a graded
and labeled coin has an added value, but this value derives from
the service provided by a reputable grading company.  This is
particularly relevant since the eye appeal evaluation is a
subjective measure dependent on the expertise of the grader.  The
tendency in the coin grading industry is to develop new and more

subtle grades to encourage customers to re-grade their coins.

See, e.g., United States v. Kayne, 90 F.3d 7, 9 (1st Cir. 1996)

("Small distinctions in grade can yield large differences in the

value of a coin."). In this context, an inventor of a new label

or grading system ought be rewarded for the innovation, but

copyright or patent law, not the Lanham Act, is the conduit to

protect the idea. See Dastar, 539 U.S. at 37. Therefore, this

Court concludes that the authorship of a coin grading system does

not bear on the "nature, characteristics, [or] qualities" of the

labeled coins. Moreover, Blake does not adequately allege that

the Defendants advertised or promoted their goods in a manner

which falsely differentiated the "SecurePlus" and "+" labeling

methodology from AURA System.[13]

---

[13] In his opposition, Blake raises the argument that
Professional Grading agreed to a "naked license" over the "+"
mark with Numismatic, the alleged licensee. Blake's Opp'n
Numismatic's Mot. 7-8. Blake first argues that Professional
Grading had no right to license the "+" mark, thus misleading the
public to believe that they "are responsible for the promulgation
of the standard." Id. at 8. This argument is but a
reformulation of the "reverse passing-off" claim and fails for
the same reasons.
    Blake's second argument is that Professional Grading gave a
naked license of the "+" mark "with no restrictions as to quality
control," thus misleading the public to believe that Professional
Grading and Numismatic "have equivalent grading standards for the
'+' symbol." Id. This assertion requires additional analysis.
    Naked licensing refers to the abandonment of a mark "by
allowing others to use the mark without exercising 'reasonable
control over the nature and quality of the goods, services, or
business on which the [mark] is used by the licensee.'" Eva's
Bridal Ltd. v. Halanick Enters., Inc., 639 F.3d 788, 789 (7th
Cir. 2011) (quoting Restatement (Third) of Unfair Competition §
33 (1995)); see Rey v. Lafferty, 990 F.2d 1379, 1392 n.10 (1st

Cir. 1993). "To be a valid license, the licensor must adequately control the quality of the goods and services provided by the licensee under the mark." Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 250 (D. Mass. 2011) (Gorton, J.). "[F]ailure to control the quality of licensed goods can constitute an abrogation of the licensor's duty to protect the informational value of the mark," and the trademark holder may lose protection of the mark. Rey, 990 F.2d at 1392 n.10 (citations omitted).

The licensor has a duty to control the uniformity of the trademark's quality "so that consumers are not deceived by the identity of names into buying a product different from what they reasonably expected." Draeger Oil Co. v. Uno-Ven Co., 314 F.3d 299, 300-01 (7th Cir. 2002) (quoting AmCan Enters., Inc. v. Renzi, 32 F.3d 233, 235 (7th Cir. 1994) (internal quotation marks omitted); Barcamerica Int'l USA Trust v. Tyfield Imps., Inc., 289 F.3d 589, 598 (9th Cir. 2002) ("[W]here a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." (quoting First Interstate Bancorp v. Stenquist, No. C-89-4106 MHP, 1990 WL 300321, at *3 (N.D. Cal. July 13, 1990)) (internal quotation mark omitted)); Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 108 (4th Cir. 1991) (holding that wholesaler's use of oil company's trademarks was deceptive and likely to confuse consumers who relied on trademarks as symbols of oil company's quality, even if customers knew that wholesaler was not "authorized distributor" of oil company).

Assignments of federally registered trademarks must be in writing. 15 U.S.C. § 1060(a)(3). Non-federally registered trademarks are still protected under common law, Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 820 (1st Cir. 1987), thus they may be licensed through implied or oral license agreements, Watec Co., Ltd. v. Liu, 403 F.3d 645, 652 (9th Cir. 2005); Hogar CREA, Inc. v. Hogar CREA Int'l of Conn., Inc., No. 08-1547 (BJM), 2011 WL 4852313, at *11-12 (D.P.R. Sept. 6, 2011).

Here, Blake contends in his opposition that Professional Grading is the senior user of the "+" mark and that the "+" mark was licensed to Numismatic. Blake's Opp'n Numismatic's Mot. 8. Blake's Complaint, however, does not allege that Professional Grading licensed the "+" mark but instead alleges that Numismatic "shared" the "+" element with Professional Grading after Numismatic had misappropriated the trade secret. Compl. ¶¶ 125-26, 134. Moreover, Blake alleged in his Complaint that each company created its own mark: Professional Grading owns the

**E.   Conversion (Count II)**

Under Massachusetts law, a person "who intentionally or wrongfully exercises acts of ownership, control, or dominion over personal property to which he has no right of possession at the time" is liable for conversion.  <u>Abington Nat'l Bank</u> v. <u>Ashwood Homes, Inc.</u>, 19 Mass. App. Ct. 503, 507 (1985) (quoting J.R. Nolan, <u>Tort Law</u> § 35 (1979)).  "The elements of conversion may be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment."  <u>In re Hilson</u>, 448 Mass. 603, 611 (2007).

At common law, a conversion claim is viable only in cases involving tangible chattels.  <u>See</u> <u>Harvard Apparatus, Inc.</u> v. <u>Cowen</u>, 130 F. Supp. 2d 161, 164 (D. Mass. 2001) (Bowler, M.J.) (noting the traditional scope of the common-law tort of conversion).  This Court has consistently held that a plaintiff is not entitled to recover for conversion of intangible property.

---

SecurePlus mark and Numismatic owns the "+" mark, Compl. ¶ 61, and each has promoted its respective label as if it had "independently created and singularly owned" each label.  Thus, they have "the right to grant licenses to one another."  <u>Id.</u> ¶ 78.

Blake failed to allege the existence of a written or implied license agreement, however, and therefore this Court does not have to decide whether Professional Grading breached any duty to control the quality of the services bearing the "+" mark, resulting in deceptive conduct that misled consumers.

See, e.g., In re TJX Cos. Retail Sec. Breach Litig., 527 F. Supp.
2d 209, 213 (D. Mass. 2007) aff'd in part, vacated in part on
other grounds 564 F.3d 489 (1st Cir. 2009); Portfolioscope, Inc.
v. I-Flex Solutions Ltd., 473 F. Supp. 2d 252, 256 (D. Mass.
2007) (Tauro, J.) (noting that conversion and replevin claims
"require an allegation of wrongful possession of tangible
property"); Jayson Assocs., Inc. v. United Parcel Serv. Co., No.
Civ.A.04-10771-RWZ, 2004 WL 1576725, at *2 (D. Mass. July 15,
2004) (Zobel, J.) ("[The defendant] properly asserts that a cause
of action for conversion . . . does not apply to intangible
items."); see also Lee v. Mt. Ivy Press, L.P., 63 Mass. App. Ct.
538, 553 n.29 (2005) (holding that defendant's conversion claim
over royalties and copyright was not preempted by the Copyright
Act but declining to reach the argument whether "conversion
claims may only be brought in connection with tangible
property").  But see In re TJX Cos. Retail Sec. Breach Litig.,
564 F.3d at 499 ("Whether or not Massachusetts limits conversion
claims to tangible property is debatable.").

    Here, Blake claims conversion of trade secrets, intellectual
property, royalties, and sale proceeds.  Compl. ¶¶ 50, 88-92,
121.

    The AURA System, the (+) designation, and Blake's marketing
plan are intangible property; therefore, Blake's claims of
conversion are not viable.  See Jayson Assocs., Inc., 2004 WL

1576725, at *2 (denying conversion claim of intangible property where plaintiff "does not allege that it owns the [creative] idea in any legal sense" and holding that "[the] Defendant cannot convert what plaintiff does not own"); see also Alliance Sec. Prods., Inc. v. Fleming & Co., 290 Fed. Appx. 380, 382 (2nd Cir. 2008) (affirming dismissal of conversion and other tort claims where sellers' marketing plan to sell a product was general knowledge due to prior sporadic and ultimately unsuccessful offers of the product); Equity Grp., Ltd. v. Painewebber Inc., 839 F. Supp. 930, 933 (D.D.C. 1993) (holding that alleged misappropriation of intangible property in form of business and marketing system could not be basis for conversion claim).

Similarly, under Massachusetts law, royalty rights, goodwill, literary rights, copyrights, trademarks, and patents are considered intangible property. In re Furst, 914 F. Supp. 734, 737 (D. Mass. 1996) (citing Mass. Gen. Laws Ann. ch. 106, § 1-206). Therefore, Blake's conversion claim as to the royalties and sale proceeds is also not viable. See Struzziero v. Lifetouch Nat'l Sch. Studios, Inc., 677 F. Supp. 2d 350, 354 (D. Mass. 2009) (Gorton, J.) (holding that unpaid wages, "owed commission[,] or similar debt" are not actionable under a conversion theory because they constitute intangible property); Discover Realty Corp. v. David, No. 1520, 2003 WL 22387138, at *3 (Mass. App. Div. Oct. 14, 2003) (requiring intangible commissions

to merge with some sort of document like a bankbook to support a theory of conversion);[14] see also Third Nat'l Bank of Hampden Cnty. v. Cont'l Ins. Co., 388 Mass. 240, 245 (Mass. 1983) (denying conversion claim because bank could not exercise dominion and control over security interest, thus there was no "property interest in the 'proceeds' of an insurance policy covering destroyed property while those proceeds are still in the hands of the insurance company").

Moreover, could a conversion claim be brought for intangible property, Blake still fails to allege that he was the rightful owner of such property.  See In re Hilson, 448 Mass. 603, 611 (2007); see also Pharmaceutical Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 308 (1st Cir. 2005) ("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others." (quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984)) (internal quotation marks omitted)).  The AURA System and the plus (+) designation

---

[14] This is not a case, nor do the parties argue to the contrary, where the merger doctrine applies to the claim for conversion for intangible property.  Under the merger doctrine, intangible property rights may be the subject of conversion if they "customarily merge in or identify with certain kinds of documents."  Commonwealth v. Rizzuto, Nos. 028008 and 028010, 1980 WL 4637, at *3 (Mass. Super. May 9, 1980) (Zobel, J.).  In order for the doctrine to apply, "the right of possession and dominion [must be inherent] in the physical document [so] that possession of that document governs exercise of the right itself."  Discover Realty Corp., 2003 WL 22387138, at *3.

were generally known to the coin grading industry and "in the public domain [] for the free use of the public." Aronson, 440 U.S. at 262.  Therefore, the Defendants did not "wrongfully exercise acts of ownership" of the property when the alleged conversion occurred because they had the right to make use of the public domain information.  See Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 230-31 (1st Cir. 2005) (holding that where the parties "jointly owned the property at issue . . . [the defendant] did not 'wrongfully exercise acts of ownership,' . . . and thus, no conversion occurred.  Hence, it is unnecessary for [the Court] to address the . . . analysis of whether intangible property, such as patent rights, can be the subject of a conversion claim").

Therefore, the motion to dismiss on the conversion count was granted in its entirety.

## F.   Breach of Contract (Count III)[15]

A breach of contract claim must allege "(1) the existence of a valid and binding contract; (2) that plaintiff has complied with the contract and performed his own obligations under it; and (3) breach of the contract causing damages."  Persson v. Scotia Prince Cruises, Ltd., 330 F.3d 28, 34 (1st Cir. 2003) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and

---

[15] The breach of contract count is directed solely against Numismatic.

38

Procedure § 1235, at 268-70 (2d ed. 2002)).[16] "When 'parties

contemplate the execution of a final written agreement,' a strong

inference is made that they 'do not intend to be bound by earlier

negotiations or agreements until the final terms are settled.'"

Mass Cash Register, Inc. v. Comtrex Sys. Corp., 901 F. Supp. 404,

415 (D. Mass. 1995) (Saris, J.) (quoting Rosenfield v. U.S. Trust

Co., 290 Mass. 210, 216 (1935)).

    In Novel Iron Works, Inc. v. Wexler Construction Co., 26

Mass. App. Ct. 401 (1988), the Massachusetts Appeals Court

explained:

> The legal principles which are to be applied in resolving
> the issue are well established.  Where, as here, parties
> negotiate orally as to the terms of an agreement while
> intending to execute a written contract, the parties
> generally are not bound until the contract is signed.
> If, however, the parties orally agree to the essential
> terms of the transaction, it may be inferred that they
> intended to bind themselves at that time and that the
> writing to be drafted and delivered is a mere memorial of
> the contract, which is already final by the earlier
> mutual assent of the parties to those terms.  Further,
> where the facts show that the parties intended to be
> bound at some point in their negotiations before
> execution of a formal contract, they will not be bound
> unless there is agreement as to the basic terms of the
> undertaking.  There must be agreement on the essential

---

[16] Numismatic argues that "[a] party suing upon an alleged
oral contract must plead greater detail than in the case of a
written agreement," following Watkins v. Omni Life Science,
Inc., 692 F. Supp. 2d 170, 175 n.5 (D. Mass. 2010) (Stearns, J.).
Numismatic's Mem. 6.  Blake correctly points out that Watkins is
inapposite because Blake's breach of contract claim - unlike that
in Watkins - pleads the time, place, and parties to the contract,
and does not style as a contract claim what in reality is a fraud
claim.  Blake's Opp'n Numismatic's Mot. 3.

> terms of the transaction in order that the nature and
> extent of the parties' obligations can be determined, and
> hence, enforced.

Id. at 407-08 (citations omitted) (internal quotation marks

omitted).

The issue, therefore, is whether Blake has alleged

sufficient facts to plausibly support the conclusion that Blake

and Schechter orally agreed to the essential terms of the

confidentiality agreement and intended to bind themselves at that

time.  Blake alleges that during a telephone conversation on

August 18, 2009, Schechter and Blake agreed to "treat all

disclosures made by Mr. Blake as highly confidential.  Schechter

further agreed to return a signed Agreement to Blake."  Compl. ¶

46.  Blake alleges that he disclosed the AURA System and market

testing proposal only after Schechter orally (and unambiguously)

agreed to keep the disclosure strictly confidential.  Id. ¶ 47.

The written agreement memorialized the oral contract between

Blake and Schechter.  See id. ¶¶ 94-97.  Numismatic's disclosure

of the confidential information to Professional Grading would

thus constitute a breach of contract.  Consequently, Blake has

alleged sufficient facts to withstand a motion to dismiss his

breach of contract claim.

   **G.   Breach of the Implied Covenant of Good Faith and Fair**

Dealing (Count IV)[17]

"In order to establish a breach of the covenant of good faith and fair dealing, a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of (the plaintiff) to receive the fruits of the contract." Boyle v. Douglas Dynamics, LLC, 292 F. Supp. 2d 198, 209-10 (D. Mass. 2003) (Stearns, J.) (quoting Laser Labs, Inc. v. ETL Testing Lab., Inc., 29 F. Supp. 2d 21, 24 (D. Mass. 1998) (O'Toole, J.)) (internal quotation marks omitted).  "[T]he implied covenant of good faith and fair dealing governs conduct of parties after they have entered into a contract; without a contract, there is no covenant to be breached." Massachusetts Eye & Ear Infirmary, 412 F.3d at 230.  "Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage." Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 229 (D. Mass. 2005); see Piantes v. Pepperidge Farm, Inc., 875 F. Supp. 929, 938 (D. Mass. 1995) (Gertner, J.) ("A mere finding that there was no 'good' reason for the termination in the absence of other indicia of lack of honesty or taking unfair advantage; or bad faith, is

---

[17] Count IV is directed solely against Numismatic.

insufficient to support a claim. . . . [T]he absence of good cause is not the equivalent of absence of good faith.").

Here, Blake alleges that a valid contract existed with Numismatic, and Numismatic breached the covenant of good faith and fair dealing.  Compl. ¶¶ 110, 111.  Numismatic argues that no contract exists; therefore, there can be no derivative implied covenant of good faith and fair dealing.  Numismatic's Mem. 10.

As matter of law, Blake alleges sufficient facts to establish an oral contract between Blake and Numismatic.  See supra section II.F.  As alleged in the Complaint, Schechter expressly agreed to treat Blake's communications as confidential and accepted such information under that agreement.  Compl. ¶ 46.  Numismatic breached the contract by disclosing Blake's marketing plan to Professional Grading.  Id. ¶¶ 65, 126.

Apart from the breach of contract claim, Blake makes additional factual allegations to sustain a breach of the covenant of good faith and fair dealing claim.  See Christensen, 360 F. Supp. 2d at 229.  Schechter did not act in good faith when he promised to sign and return the Agreement.  On four different occasions, Blake sent copies of the Agreement, and each time Schechter gave different excuses to avoid returning the Agreement.  The first time, Schechter said that he had misplaced the Agreement.  Compl. ¶¶ 44-46.  The second time, Blake e-mailed the Agreement to Schechter, and despite Schechter's promise to

42

return the signed Agreement, he never did.  Id. ¶ 46.  Believing

Schechter's promise, Blake disclosed the AURA System and his

marketing strategy, id. ¶¶ 47-50, but once Schechter had heard

Blake's marketing plan, he did not communicate with Blake or

respond to his requests for the signed Agreement, even though

Blake sent Schechter two additional copies, id. ¶¶ 55-57.  The

reasonable implication of Schechter's conduct is that he did not

intend to be bound by the written contract.  Blake thus

sufficiently alleges at this stage that Schechter's promise to

return the signed Agreement was a pretext, a mere subterfuge to

"receive the fruits" of the Agreement (that is to say, Blake's

marketing plan).  Moreover, Schechter took unfair advantage of

Blake's ideas by striking a deal with Professional Grading based

on Blake's marketing plan, while Blake did not receive any

compensation for the use of his ideas.  Id. ¶ 67.

Therefore, Blake as matter of law sufficiently alleges a

violation of the covenant of good faith and fair dealing.

### H.   Unjust Enrichment (Count V)

To succeed in a claim for unjust enrichment, a plaintiff

must show: "(1) a benefit conferred upon the defendant by the

plaintiff; (2) an appreciation or knowledge by the defendant of

the benefit; and (3) acceptance or retention by the defendant of

the benefit under the circumstances would be inequitable without

payment of its value."  Massachusetts Eye & Ear Infirmary v. QLT

Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009) (citing

26 Samuel Williston & Richard A. Lord, A Treatise on the Law of

Contracts § 68:5 (4th ed. 1993)).  "[C]onsiderations of equity

and morality play a large part . . . in constructing a quasi-

contract," Salamon v. Terra, 394 Mass. 857, 859 (1985)

(alterations in original) (quoting 1 A. Corbin, Contracts § 19

(1963)), thus "[t]he benefit must be unjust, a quality that turns

on the reasonable expectations of the parties," Community

Builders, Inc. v. Indian Motocycle Assocs., Inc., 44 Mass. App.

Ct. 537, 560 (1998).  A claim for unjust enrichment based on

unauthorized disclosure of confidential information requires a

showing that the defendant used the confidential information at

the plaintiff's expense.  Massachusetts Eye & Ear Infirmary, 552

F.3d at 58.

### 1. Blake Fails to State a Claim for Unjust Enrichment Against Professional Grading and Universe

Blake alleges that the Defendants have unjustly gained

valuable benefits at his expense, including the substantial

profits they are making from the AURA System.  Compl. ¶ 114.

Blake's claim thus falls within the realm of unjust enrichment

based on misuse of confidential information.  See Massachusetts

Eye & Ear Infirmary, 552 F.3d at 57.

First, Blake alleges that he disclosed only the publicly

known aspects of the AURA System to Professional Grading.  Compl.

¶ 39.  Professional Grading, through Willis, declined to enter

into a market testing agreement with Blake on the AURA System.
Id. ("Willis abruptly declined Mr. Blake's proposal for a market
testing arrangement with a terse 'Thanks but no thanks.'").
Thus, Blake does not allege that he directly conferred the
benefit of confidential information upon Professional Grading.

Second, Blake further alleges that Professional Grading is
liable because it obtained confidential information from
Numismatic.  Blake relies on Data General Corp. v. Grumman
Systems Support Corp., 795 F. Supp. 501 (D. Mass. 1992) (Skinner,
J.), which he cites for the proposition that a third party can be
liable for misappropriation of a trade secret if that party
"knowingly benefits from a trade secret which a person in a
confidential relationship obtained from the plaintiff."  Id. at
507.

Blake's reliance on this case is misplaced, however, because
unjust enrichment and misappropriation of a trade secret are
distinguishable causes of action.  Massachusetts Eye & Ear
Infirmary, 552 F.3d at 61.  Blake's claim in this regard fails to
state that the benefit was "conferred upon the defendant by the
plaintiff."  Id. at 57 (emphasis added).  The First Circuit has
explained that a "claim of unjust enrichment is appropriate
'where an agreement is too indefinite to be enforced . . . [or]
where no contract is made because each of the parties had a
materially different understanding of the terms.'"  Massachusetts

45

Eye & Ear Infirmary, 412 F.3d at 233-34 (alteration in original) (quoting 1-1 Corbin on Contracts § 1.20(b) (2004)).  Any alleged interaction regarding the confidential information took place between Numismatic and Blake.  Professional Grading is too far removed from this exchange to warrant liability on an unjust enrichment theory.

Therefore, this Court holds that Blake fails to state sufficient facts to sustain a claim for unjust enrichment against Professional Grading and Universe.

### 2. Blake States a Claim for Unjust Enrichment Against Numismatic

As stated above, an unjust enrichment claim based on unauthorized disclosure or misuse of confidential information requires a plaintiff to show that the defendant used the plaintiff's confidential information at the plaintiff's expense. Massachusetts Eye & Ear Infirmary, 552 F.3d at 57-58.

Here, even though Schechter did not sign the confidentiality agreement sent by Blake, Schechter expressly agreed to treat all disclosures made as confidential.  Compl. ¶ 46.  This oral agreement does not extend to previously disclosed information or information in the public domain.  Foster-Miller, Inc., 210 F.3d at 10 ("Information that is . . . readily known or knowable to the interest of the public cannot . . . be made confidential simply by slapping it with a restrictive label.").  Thus, the confidentiality agreement does not extend to the AURA System and

the plus(+) designation, as this Court has already held that those matters were in the public domain. See Blake's Opp'n Numismatic's Mot., Ex. B at 6-7 (recounting that Lange told Blake he already had a copy of Blake's article discussing the AURA System, which was published in the Lincoln Cent Matte Proofs book authored by Flynn); supra section II.C.1.

The agreement does, however, apply to Blake's marketing plan to use the plus (+) symbol for eye appeal grading, which he conveyed to Numismatic under the promise of confidentiality. See Compl. ¶ 50 ("Mr. Blake further disclosed his marketing plans to introduce the new value-added methods into the numismatic community."); supra section II.C.3. Blake alleges that Numismatic used the confidential information regarding his marketing plan at his expense. Id. ¶ 67. Specifically, he alleges that Numismatic shared this information with Professional Grading and that they jointly employed his market testing ideas in launching SecurePlus and the '+' labeling methodology. Id. ¶¶ 60, 64-67. Blake further alleges that he did not receive any licensing fee or other compensation for the use of his ideas. Id. ¶ 67. He claims he has lost the opportunity to license his ideas to other grading services and derive compensation therefrom. Id. ¶ 74. Blake thus sufficiently alleges at this stage that Numismatic used the confidential information regarding the marketing plan at Blake's expense, which constitutes unjust

enrichment.  See Massachusetts Eye & Ear Infirmary, 552 F.3d at 58.

**I.   Blake Fails to State a Claim for Civil Conspiracy (Count VI)**

"Massachusetts recognizes two types of civil conspiracy, so-called 'true conspiracy' and conspiracy based on section 876 of the Restatement (Second) of Torts." Taylor v. Am. Chemistry Council, 576 F.3d 16, 34 (1st Cir. 2009) (citing Kurker v. Hill, 44 Mass. App. Ct. 184, 188 (1998); Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 362-63 (D. Mass. 2002) (Dein, M.J.)).  The "true conspiracy" is a very limited cause of action that requires an element of coercion. Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994).  Blake does not allege coercion by the Defendants; thus, his claim of civil conspiracy relies on § 876 of the Restatement (Second) of Torts.

A civil conspiracy claim, based on § 876 of the Restatement, is a form of vicarious liability that requires an underlying tort. Taylor, 576 F.3d at 34-35.  Under this theory, "[t]o prove a civil conspiracy claim, 'the [plaintiff] must show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement.'" Boyle v. Barnstable Police Dept., No. 09-11435-MBB, 2012 WL 2126868, at *9 (D. Mass. June 11, 2012) (Bowler, M.J.) (quoting Bartle v. Berry, 80 Mass. App. Ct. 372, 383-84 (2011)); see Gutierrez v. Mass. Bay Transp. Auth., 437 Mass. 396, 415 (2002).

48

Section 876 includes civil conspiracy claims brought under a "concert of action" theory or a "substantial assistance" theory. <u>Taylor</u>, 576 F.3d at 35.

Blake advances both theories.  Compl. ¶¶ 121, 122.  The underlying tort for Blake's civil conspiracy claim is the conversion claim.  <u>Id.</u>  This Court held that the latter claim is not viable.  <u>See supra</u> section II.E.

Under both theories, "concert of action" and "substantial assistance," Blake has to allege an underlying tort.  <u>Taylor</u>, 576 F.3d at 35.  Blake contends that Numismatic disclosed allegedly confidential information to Professional Grading, Compl. ¶ 65, and then Numismatic and Professional Grading "together" analyzed the disclosed information in an attempt to "convert" the AURA System for themselves, <u>id.</u> ¶¶ 66, 121, in furtherance of the breach of contract, <u>id.</u> ¶ 122.  The alleged "concert of action" and "substantial assistance" occurred <u>after</u> Numismatic disclosed the information; therefore, the underlying tort hinges on the conversion claim, rather than the misappropriation of trade secret claim.  Having dismissed Blake's conversion count because this Court does not recognize the conversion of intangible property, Blake does not ascribe any tortious conduct to Professional Grading.  <u>McLaughlin</u> v. <u>J-PAC, LLC</u>, No. 10-2594-BLS1, 2011 WL 1758945, at *2 (Mass. Super. Apr. 14, 2011) (Lauriat, J.) (dismissing civil conspiracy claim where plaintiff

"allege[d] that the defendants conspired and acted jointly to refuse to comply with the Employment Agreement's severance provision" because those "allegations of conspiracy hinge on breach of contract" and do "not ascribe any tortious conduct to the defendants.").

Turning to the underlying tort of misappropriation of trade secrets - the only tort claim surviving this motion to dismiss - Blake's allegations fail as matter of law.

Under the "substantial assistance" theory, the plaintiff has to show that the defendant knew that the tortfeasor's conduct constituted a breach of duty, the assistance was a substantial factor in causing the resulting tort, and the defendant had unlawful intent. Taylor, 576 F.3d at 35-36; Kurker, 44 Mass. App. Ct. at 189 ("Key to [the civil conspiracy] cause of action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan.").

Here, Professional Grading must know that Numismatic's conduct constitutes a breach of a duty and give assistance that is a substantial factor in causing the resulting tort.  Blake's conclusory assertion that Numismatic disclosed Blake's AURA System and marketing plan to Professional Grading, Compl. ¶ 65, fails to allege that Professional Grading knew that Numismatic had agreed to maintain confidentiality or that Professional Grading knew the idea was a misappropriated trade secret.

50

Finally, there is no allegation that Professional Grading did anything to encourage Numismatic to breach a duty.  See Kyte v. Philip Morris Inc., 408 Mass. 162, 167-68 (1990) (holding that claim of civil conspiracy against manufacturer of cigarettes for cigarettes sold to minors in convenience stores fails because "[a] general awareness that retail stores sell cigarettes to minors is not sufficient to show the level of knowledge that would give rise to liability for conspiracy," id. at 168); cf. Kurker, 44 Mass. App. Ct. at 189-90 (denying dismissal of civil conspiracy claim against attorneys who knowingly provided substantial assistance to majority shareholders in plotting to secure one shareholder's vote and in orchestrating assets purchase when they knew the shareholder plan would constituted breach of fiduciary duty).  Therefore, Blake does not satisfy the required elements of the "substantial assistance" theory.

Under the "concerted action" theory, Professional Grading and Numismatic must have agreed to work toward an unlawful result and take steps to do it.  See Grant, 183 F. Supp. 2d at 363 (holding that under a "concerted action" theory, the plaintiff "must establish a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result," id. (quoting Kurker, 44 Mass. App. Ct. at 189) (internal quotation marks omitted)).

Here, Blake does not allege that Numismatic and Professional Grading planned for Numismatic to trick Blake into telling them about the AURA System and the marketing idea so that both companies could misappropriate the trade secret.  According to Blake, Compl. ¶ 65, Professional Grading came into the picture later, after Numismatic had the information, id. ¶¶ 66, 121. Therefore, Blake failed to allege that the Defendants agreed to take steps toward misappropriating Blake's trade secrets.

### J.    Blake States a Claim for Misappropriation of a Trade Secret (Count VII)

Under Massachusetts law, it is unlawful for a person to steal or take any trade secret "by deception . . . with intent to convert to his own use."  Mass. Gen. Laws ch. 93, § 42.  To state a claim for misappropriation of a trade secret, the plaintiff must allege (1) the existence of a trade secret; (2) that the plaintiff took reasonable steps to protect the secret; and (3) that the defendant acquired and used, by improper means or through breach of a confidential relationship, the trade secret. See Data Gen. Corp., 825 F. Supp. at 357.  "A trade secret may consist of any . . . compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it."  J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736 (1970).  "Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret."  Id.

(quoting Restatement (First) of Torts § 757 cmt. b (1939))

(internal quotation mark omitted).

Here, Blake alleges that the AURA System constitutes a trade
secret and was misappropriated by the Defendants.  Compl. ¶ 127.
The AURA System and the use of the plus (+) designation in the
grading industry is public knowledge.  See supra section II.C.
Blake did not take reasonable measures to keep the AURA System
secret; rather, he published articles about the AURA System which
were available to the public.  Blake's Opp'n Numismatic's Mot.,
Ex. B, at 5-7 (indicating that Blake published his AURA System in
Lincoln Cent Matte Proofs, authored by Flynn).[18]  While perhaps
Blake did not disclose the entirety of the AURA System, he has
not alleged with sufficient particularity which portion of the
AURA System remained a trade secret at the time it was disclosed
to Numismatic.  Without such specificity, the Court is not able
to ascertain a trade secret in the AURA System.  See  Sutra, Inc.
v. Ice. Exp., ehf, No. 04-11360-DPW, 2008 WL 2705580, at *4 (D.
Mass. July 10, 2008) (Woodlock, J.) (dismissing trade secret
claim because plaintiff's "description of its alleged trade
secret is overly broad and this lack of specificity is fatal to

---

[18] The parties dispute the effect of Blake's patent
application in publicizing the trade secret.  Universe &
Professional Grading's Mem. 9; Numismatic's Mem. 15-16; Blake's
Opp'n Universe & Professional Grading's Mot. 12.  This dispute is
immaterial, as this Court holds that Blake independently released
information about the AURA System apart from the application.

its claim"); <u>Staffbridge, Inc.</u> v. <u>Gary D. Nelson Assocs., Inc.</u>,
No. 024912BLS, 2004 WL 1429935, at *3 (Mass. Super. June 11,
2004) (Gestel, J.) (holding that description including source
code, database schema, and customer databases did not adequately
distinguish the protectable parts of software from those that
were not protectable); <u>see also</u> <u>IDX Sys. Corp.</u> v. <u>Epic Sys.</u>
<u>Corp.</u>, 285 F.3d 581, 583-84 (7th Cir. 2002) (holding that "a 43-
page description of the methods and processes underlying and the
interrelationships among various features making up [plaintiff's]
software package" was insufficiently specific because it failed
to "separate the trade secrets from the other information that
goes into any software package").  Therefore, Blake's
misappropriation claim fails as to the AURA System because Blake
has not alleged reasonable steps taken to maintain secrecy.

Blake has alleged sufficient facts, however, of a trade
secret in his marketing plan to test the market and implement the
plus (+) symbol to grade a coin's eye appeal.  Compl. ¶ 50.  The
marketing plan certainly constitutes a "compilation of
information" with which one can "obtain an advantage over
competitors who do not know or use it."  <u>J.T. Healy</u>, 357 Mass. at
736.  The Defendants have not argued that these marketing ideas
were public knowledge, and Blake disclosed them to Numismatic
only after Schechter orally agreed to keep them confidential.
Compl. ¶¶ 47-50.  Blake has sufficiently pled that Numismatic

misappropriated the trade secret by breach of a confidential
relationship with Blake.  Id. ¶ 50.

   Numismatic argues that Blake failed to allege that he made
continuous use of the secret in connection with a business,
relying on J.T. Healy.  See Swartz v. Schering-Plough Corp., 53
F. Supp. 2d 95, 101 n.7 (D. Mass. 1999) ("While there is no
precedent directly on point, the 'continuous use' requirement
imposed by the J.T. Healy court implies that trade secret
misappropriation incorporates an 'abandonment' exception.").
Blake's trade secret was at an entrepreneurial stage; the
marketing plan was created for use in connection with a business
and was ready to be launched.  The fact that Blake was seeking a
partner to launch the AURA System and marketing plan is enough to
establish that Blake used the marketing ideas in "business,"
albeit in its earliest of stages.  Moreover, Blake's use of the
marketing plan was "continuous" as alleged.  Blake alleges that
he was actively searching for partners to test his method in the
coin market.  Specifically, Blake alleges that he attempted to
market his ideas to Professional Grading, who was not interested,
Compl. ¶ 39, and Numismatic, who entertained multiple e-mails and
phone calls with Blake, id. ¶¶ 41-56, and discussed the
possibility of a licensing agreement, until Schechter stopped
responding, id. ¶¶ 53-57.  Blake's efforts on this record
sufficiently qualify as "continuous use" at this stage in the

proceedings.

Blake's misappropriation claim against Professional Grading and Universe fails for the same reason that his civil conspiracy claim fails.  Under Massachusetts law, "a third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for the misappropriation of that trade secret." Data Gen. Corp., 795 F. Supp. at 507 (citing Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., 381 Mass. 1, 3 n.2 (1980)).  But Blake does not allege that Professional Grading knew that the marketing plan it implemented with Numismatic was misappropriated from Blake, or that Numismatic breached a duty of confidentiality owed to Blake by disclosing and using the plan.  Therefore, Professional Grading and Universe cannot be liable for Numismatic's alleged misappropriation.

## K.  Unfair Business Practice (Count VIII)

Massachusetts General Laws, Chapter 266, Section 91 ("Chapter 266, Section 91") prohibits the publication, dissemination, or circulation of advertisements containing "any assertion, representation or statement of fact which is untrue, deceptive or misleading."  Mass. Gen. Laws ch. 266, § 91.  A plaintiff must plead this claim with specificity, as it falls within the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  See Martin v. Mead Johnson Nutrition Co.,

56

No. 09-11609-NMG, 2010 WL 3928707, at *4 (D. Mass. Sept. 30, 2010).

First, Blake's claim that the Defendants misled the public under Chapter 266, Section 91 by failing to attribute the plus (+) grading label to Blake is identical to his "reverse passing-off" claim under the Lanham Act (Count I) and fails for the same reasons. See supra section II.D.

Second, Blake alleges that the Defendants were engaged in "business chicanery" unrelated to their Lanham Act violations, including wrongful conversion, unjust enrichment, civil conspiracy, breach of contract, and misappropriation of confidential information. Compl. ¶ 140; Blake's Opp'n Numismatic's Mot. 15. Blake does not allege that the Defendants' advertisements contain any false or misleading statements about the Defendants' conduct. Blake cites American Medical Systems, Inc. v. Biolitec, Inc., 774 F. Supp. 2d 375 (D. Mass. 2011) (Ponsor, J.), to argue that Chapter 266, Section 91 protects against "unfair business practices" in addition to "false advertising" claims. Blake's Opp'n Numismatic's Mot. 14; see also American Med. Sys., Inc., 774 F. Supp. 2d at 392-93 (holding that "the Court will follow the authority from this district, to the effect that the state analogue prohibiting false advertising . . . rises or falls with the federal claim. . . . Plaintiffs have not alleged any unfair business practices other than those

alleged in the false advertising claim" (alteration in original) (citation omitted) (quoting <u>Holmes Grp., Inc.</u> v. <u>RPS Prods., Inc.</u>, 424 F. Supp. 2d 271, 289 n.19 (D. Mass. 2006) (Saylor, J.)) (internal quotation marks omitted)).  Such an argument runs contrary to the language of the statute.  <u>See</u> Mass. Gen. Laws ch. 266, § 91 ("Any person who . . . publishes, disseminates, [or] circulates . . . [any] advertisement [that] contains any assertion, representation or statement of fact which is untrue, deceptive or misleading . . . shall be punished by a fine . . . .").  Blake's allegations of "business chicanery," therefore, do not state a claim under Chapter 266, Section 91, because Blake's claims exceed the scope of the statute.

### L.   Injunctive Relief (Count IX)

Because Blake has stated some claims that survive the present motion to dismiss, ultimate injunctive relief is at least a possibility on those claims.  Therefore, dismissal of this count was denied.

## III. CONCLUSION

For these reasons, this Court ruled as follows:

The motion to dismiss the alleged violations of the Lanham Act, 15 U.S.C. § 1125(a) (**Count I**) was GRANTED;

The motion to dismiss the Conversion claim (**Count II)** was GRANTED;

The motion to dismiss the Breach of Contract claim (**Count**

**III**) was DENIED;

The motion to dismiss the Breach of the Covenant of Good Faith and Fair Dealing claim (**Count IV**) was DENIED;

The motion to dismiss the Unjust Enrichment claim (**Count V**) was GRANTED as to Professional Grading and Universe and GRANTED as to Numismatic with regard to the AURA System but DENIED as to Numismatic with regard to the marketing plan;

The motion to dismiss the Civil Conspiracy claim (**Count VI**) was GRANTED;

The motion to dismiss the Misappropriation of Trade Secrets claim (**Count VII**) was GRANTED in part and DENIED in part.  The motion was GRANTED as to Professional Grading and Universe in its entirety, GRANTED as to Numismatic with regard to the AURA System, and DENIED as to Numismatic with regard to the marketing plan;

The motion to dismiss the Unfair Business Practices claim for violation of Massachusetts General Laws, Chapter 266, Section 91 (**Count VIII**) was GRANTED;

The motion to dismiss the claim for Injunctive Relief (**Count IX**) was DENIED.

/S/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE